**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

LESHIA ROBINSON-JONES,        :
                                  :
                Plaintiff,     :     C.A. No.: 10-588-LPS/MPT
                                  :
     v.                          :
                                  :
MICHAEL J. ASTRUE,             :
Commissioner of Social Security,   :
                                  :
              Defendant.   :

**REPORT AND RECOMMENDATION**

**Introduction**

Leshia Robinson-Jones ("plaintiff") filed this action pursuant to 42 U.S.C. § 1383(c)(3) against Michael J. Astrue, Commissioner of Social Security ("defendant"), on July 9, 2010. Plaintiff seeks judicial review under 42 U.S.C. § 405(g) of the final decision by the Social Security Administration denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("SSA").[1] Currently before the court are the parties' cross motions for summary judgment. For the reasons stated below, the court recommends that the decision of the Administrative Law Judge ("ALJ") be affirmed and defendant's motion for summary judgment be granted.

**Jurisdiction**

Under 42 U.S.C. § 405(g), a district court has the jurisdiction to review an ALJ's

_____

[1] *See* 42 U.S.C. §§ 401-434, 1381-83(f).

decision once it becomes the final decision of the Commissioner.[2]  A decision of the

Commissioner becomes final when the Appeals Council either affirms the ALJ's

decision, denies review of an ALJ's decision, or when the claimant fails to appeal the

ALJ's decision within 60 days after an unfavorable ruling.[3]

In the instant matter, the Commissioner's decision became final when the

Appeals Council denied review of the ALJ's determination against plaintiff.  Thus, this

court has jurisdiction to review the ALJ's decision.

## Procedural Background

On February 27, 2006, plaintiff filed applications for DIB and SSI alleging

disability as of January 1, 2004.  The claims were denied initially on September 15,

2006, and upon reconsideration on March 9, 2007.  Plaintiff then timely requested a

review hearing before an ALJ.  A video hearing before the ALJ was held on June 17,

2008.  The ALJ denied disability status to plaintiff under the Social Security Act on

August 6, 2008.  After the denial, plaintiff requested review from the Appeals Council on

August 11, 2008, which was denied on May 14, 2010.  On July 9, 2010 plaintiff filed for

summary judgment in the District Court of Delaware.

## Background

Plaintiff was forty-three years old at the onset of the alleged disability.  Plaintiff

previously worked for Cigna as a customer service representative for twenty-five years

---

[2] 42 U.S.C. § 405(g) provides, "[a]ny individual, after any final decision of the
Commissioner of Social Security made after a hearing to which he was a party . . . may
obtain a review of such decision by a civil action . . . brought in the district court of the
United States for the judicial district in which the plaintiff resides."
    [3] *See* 20 C.F.R. § 416.1455; *see also* 20 C.F.R. § 404.905.

until she was laid off because Cigna was relocating.  She was later employed part time

for the Port of Wilmington until she fell and landed on her back at a laundromat in 2003.

She has not worked since this accident, but has completed an associates degree in

criminal justice.  She alleges disability as a result of back and neck pain, numbness in

her upper right extremity, asthma, blindness in one eye, thyroidism, depression, and

anxiety.  Ultimately, the main issue in this case is whether the ALJ had a substantial

basis to discount the medical opinion of her primary care physician by excluding it from

the hypothetical description of a disabled worker as presented to the vocational expert

("VE").

**Medical Evidence**

### A.  Neck and Back Pain

On November 12, 2003, while at a laundromat, plaintiff fell backwards over a

step stool, causing her to twist and fall flat on her back onto a cement floor.

Immediately afterwards she was able to ambulate, but awoke with increased pain the

following day. That same day, she sought treatment from Doctor Goodman, her family

physician. Subsequently, she underwent a CT Scan of her brain, which was normal.  He

prescribed rest for a week.[4]

Thereafter, on December 1, 2003, an x-ray was performed by Dr. Koniver at the

request of Dr. Goodman.  Dr. Koniver diagnosed mild degenerative disc disease at C3-4

and C5-6.[5]

---

[4] D.I. 18 at 411-14.
[5] *Id.* at 241.

At the initial evaluation performed by Dr. Beneck[6] on March 4, 2004, he found no evidence of radiculopathy or disc extrusion, and concluded her pain originated from a lumbosacral strain and sprain and a cervicothoracic strain and sprain. He prescribed physical therapy three times a week and manual treatments two times a week.[7] Plaintiff followed the treatment plan and reported improvement at a follow up office visit on July 1, 2004.[8] On September 16, 2004, plaintiff was again evaluated by Dr. Beneck, and reported that her chronic neck and back pain persisted, with alleviation of some pain through the therapy. Dr. Beneck scheduled an MRI Scan of her neck and back which plaintiff could not have done immediately for financial reasons.[9]

On September 28, 2004, plaintiff was seen at the emergency room for severe back pain and was prescribed Percocet.[10]

On October 14, 2004, plaintiff returned to Dr. Beneck for increased severity of her chronic back and neck pain. In addition, her sleep was limited to three to four hours nightly because of low back pain. She was prescribed Flexeril and stretch exercises.[11] On November 18, 2004, plaintiff returned to Dr. Beneck for increased pain and more frequent flare ups. Her gait was slow and labored. She was prescribed Naprosyn and a TENS unit. An MRI was again recommended.[12] A follow up office visit occurred on January 27, 2005 with plaintiff complaining of increased pain in her lower back. Dr.

---

[6] Dr. Beneck is a sports medicine rehabilitation physician.
[7] *Id.* at 309.
[8] *Id.* at 305.
[9] *Id.* at 301-02.
[10] *Id.* at 244.
[11] *Id.* at 299.
[12] *Id.* 18 at 297.

Beneck's differential diagnosis was disc or joint related. A CAT scan was scheduled. Dr. Beneck continued the exercise program, and prescribed Vicoprofen for sleep.[13]

On February 24, 2005, another follow up with Dr. Beneck occurred. Plaintiff reported continued neck and back pain, but desired to return to work. Dr. Beneck felt that her complaints were probably related to a small disc protrusion, but could not confirm without an MRI. She was advised to continue with her exercise routine and TENS unit. Her work restrictions were no lifting, pulling, and pushing greater than 20 pounds, and no repetitive bending, lifting, or twisting. She was advised to continue her schooling on a full time basis and seek assistance from the Division of Vocational Rehabilitation ("DVR") .[14]

It was not until February 6, 2006 that plaintiff had another appointment with Dr. Beneck. This one year gap was due to insurance issues. According to plaintiff, the same symptoms were ongoing, now with pain radiating into her right arm and hand. Significant myofascial-type pain and somatic dysfunction was evident on the right side of her neck. Dr. Beneck ordered an EMG, and prescribed physical therapy three times a week along with Lortab.[15] The EMG finding of February 13, 2006 was a mildly abnormal right upper extremity. Because of this finding, an MRI of the cervical spine was recommended.[16] The MRI performed on February 17, 2006 revealed developmental lumbar spinal canal stenosis; mild degenerative disc disease at T11-12; L2-3 and L3-4 mild disc bulges; and a superimposed broad based left side disc

---

[13] *Id.* at 294.
[14] *Id.* at 291-92.
[15] *Id.* at 290.
[16] *Id.* at 284.

herniation.[17]

At the request of Dr. Goodman, plaintiff began seeing Dr. Yalamanchili at the Delaware Neurosurgical Group on August 23, 2006.  His diagnosis attributed a significant portion of her pain to cervical disc disease and her arm pain was likely due to ulnar neuropathy.  He concurred with conservative treatment pending the results of the additional testing he requested.[18]  A CT scan was done on August 30, 2006 that showed a congenital narrowing of the bony spinal canal through the cervical region, broad disc bulge at C2-C3, a large disc herniation at C4-C5, and a narrowing of the C5-C6 disc space.[19]  On September 11, 2006, a follow up visit occurred with Dr. Yalamanchilli who suspected cervical disc disease and recommended either surgery or steroid injections, with a preference to initially try injections.[20]

Dr. Beneck provided a final report on plaintiff's status on September 18, 2006.  He found that she had permanent injuries due to cervical disc herniation, mild cervical radiculopathy and a lumbosacral sprain and strain.  He concluded that if the symptoms worsen, plaintiff should seek steroid injections.  He also reconfirmed her work limitations from February 24, 2005.[21]

On September 22, 2006, plaintiff consulted with Dr. Chiang who recommended cervical ESIs (steroid injections).  Plaintiff expressed concern about the risk of paralysis associated with this treatment.[22]

---

[17] *Id.* at 435-36.
[18] *Id.* at 327.
[19] *Id.* at 439.
[20] *Id.* at 324.
[21] *Id.* at 445.
[22] *Id.* at 448.

From October 19, 2006 through December 19, 2006, plaintiff consulted with Dr. Kim and underwent pain management and acupuncture therapy. Dr. Kim noted significant improvement (minimal tenderness and reduced pain) by the eighth and final treatment.[23] Plaintiff confirmed such improvement as evidenced by her statements to a vocational rehabilitation advisor around the same time.[24] This relief, however, was temporary.[25]

On May 7, 2007, plaintiff returned to Dr. Yalamanchili who again advised the following options: continue with the conservative treatment, receive cervical steroid injections, or surgery. Plaintiff objected to the injections because of the paralysis risk, but wanted to consider surgery. Another MRI and EMG were ordered.[26] The EMG performed on the upper right extremity was normal.[27] Plaintiff returned to Dr. Yalamanchili on June 18, 2007 to discuss the results of the MRI, which showed a moderate to large central disc herniation at C4-5 with some cord compression. Dr. Yalamanchili suspected this herniation was the source of her pain, and discussed surgery with plaintiff, which he "encouraged" her to consider.[28]

Throughout the time frame herein, Dr. Goodman has been plaintiff's primary treating physician. Over twelve consultations with Dr. Goodman occurred since 2004. Most documented consultations with other doctors showed direct communication with

---

[23] *Id.* at 368-69.
[24] *Id.* at 582.
[25] *See*, D.I. 18 at 571-73.
[26] *Id.* at 464.
[27] *Id.* at 459.
[28] *Id.* at 457.

7

Dr. Goodman as the referring physician.[29]  In addition, a residual functional capacity questionnaire ("RFC") was completed by Dr. Goodman on June 26, 2007, wherein he noted that within a normal workday plaintiff could sit and stand for two hours, but required at least a three minute break every thirty minutes.  His report included a lifting restriction of ten pounds.  Dr. Goodman further opined that plaintiff would be absent more than four days per month as a result of her condition.[30]  He also concluded that depression contributed to her limited concentration.[31]

In July and October of 2007, plaintiff began treatment with Dr. Bandera who confirmed her previous diagnosis, continued the home rehabilitation program, and prescribed Percocet.[32]  Beginning in February 2008, plaintiff began seeing Dr. Michael Schettino for problems that include a herniated cervical disc, sciatica, unstable angina, COPD, hypertension, and an abnormal right breast mass.[33]  Dr. Schettino prescribed physical therapy which provided minor improvement in the neck pain, and only minimal relief of her arm symptoms.  The physical therapist also recommended injections for pain relief, which were again rejected by plaintiff for the same reasons previously noted herein.[34]  Dr. Schettino's final prognosis was that surgery was the only option to alleviate her pain.  He further recommended that a formal RFC be completed by the physical therapist.[35]

---

[29] *Id.* at 239, 241, 322.
[30] *Id.* at 405-09.
[31] *Id.*
[32] *Id.* at 497.
[33] *Id.* at 528-52.
[34] *Id.* at 553.
[35] *Id.* at 590.

**Mental Health Issues:**

During the course of treatment for pain relief following the fall of 2003, plaintiff was also examined and treated for mental health issues. Dr. Kurz saw plaintiff seven times between June 14, 2006 and October 4, 2006 for such concerns. In his mental health RFC completed on January 11, 2007, Dr. Kurz opined that plaintiff suffered from depression and anxiety due to chronic pain, financial problems, and marital issues. He noted her current GAF score at 65, with 80 as the highest for the past year. He concluded that plaintiff would likely miss about three days of work per month for mental health related issues.[36] Dr. Kurz addressed the possibility of plaintiff exaggerating her symptoms to avoid working, but in light of her prior history of employment and her expressed desire to return to work, he concluded that she was neither exaggerating nor malingering.[37]

From August 2007 to October 2007, plaintiff underwent psychotherapy with Nancy Ball, LCSW. Ball confirmed plaintiff suffered with depression and low energy resulting from her divorce, chronic pain, and financial difficulties.[38] Plaintiff also consulted with Karen Cratz, LCSW from February 14, 2008 to April 3, 2008, who confirmed the same diagnoses as Ball.[39]

**Vocational Rehabilitation and Education**

In June 2005, plaintiff sought financial assistance from DVR to obtain a degree in criminal justice at Delaware Technical and Community College, and was certified as

---

[36] *Id.* at 340-45.
[37] *Id.* at 352.
[38] *Id.* at 504-06.
[39] *Id.* at 523-527.

9

qualifying for assistance on July 29, 2005.[40]  She continued the classes after her injury in 2003, and in May 2006, completed her degree and 128 hours of internship at the Family Court under the Probation and Parole division.  DVR also helped her with medical expenses and opportunities for employment.  She no longer qualifies for the services of DVR because according to DVR, no work is available due to increased pain.[41]  A letter from her DVR advisor dated June 16, 2008 was included in the record that explained the great hardship and pain plaintiff underwent in achieving her degree.  The advisor also stated that plaintiff's decreasing ability to tolerate pain has precluded her from searching for employment.[42]

**SSA Consultative Opinions**

Dr. Irwin Lifrak (internist) performed a consultative examination of plaintiff on August 24, 2006.  His diagnostic impression was degenerative joint disease and possible disc damage.  Dr. Lifrak opined that plaintiff can sit and stand for up to five hours in an eight hour work day, with normal breaks and could lift up to five pounds with her right hand.[43]

Dr. Michael Borek, D.O. (general practitioner) was a state non-examining consultant from DDS[44] who completed an RFC of plaintiff on September 14, 2006.[45]  His conclusion was that plaintiff could sit for six hours and stand for at least two hours in a eight hour workday, and was limited to lifting ten pounds, and to frequent, but not

---

[40] *Id.* at 186.
[41] *Id.* at 570.
[42] *Id.*
[43] *Id.* at 318.
[44] Disability Determinations Service
[45] *Id.* at 332-38.

10

continuous, use of her right upper extremity. He qualified plaintiff for sedentary work. A review of this RFC was done by Dr. Acuna on March 7, 2007, who confirmed plaintiff's increased pain and symptoms, but nonetheless agreed with Dr. Borek's conclusions.[46]

In addition, a mental RFC was completed by state psychological consultant, Dr. Christopher King, on March 7, 2007. He questioned plaintiff's credibility regarding her symptoms, but confirmed that she was moderately limited to simple tasks in a low stress job setting.[47]

**Administrative Law Hearing:**

I. Testimony of Leshia Robinson-Jones

Plaintiff testified that she was currently forty seven years old, 5'5 in height, and weighed 185 pounds. She indicated that she has lived alone since her divorce in November 2007 that was a result of an abusive relationship. Plaintiff stated that she drives two to three times a week with difficulty because she is unable to turn her body to the right and experiences pain in her back.

Plaintiff confirmed that she worked at Cigna for twenty five years in customer service. That job ended when Cigna relocated in 2002. She returned to work in November 2003 at the Port of Wilmington following three different surgical procedures involving her heart, thyroid, and a hysterectomy. Plaintiff described the fall that purportedly caused her disabilities: she tripped over something, "flipped up in the air, twirled around and landed on my head and back on concrete."[48] Plaintiff explained that

---

[46] *Id.* at 390.
[47] *Id.* at 404.
[48] *Id.* at 36.

she attempted to return to work after the fall as evidenced by her internship with the probation and parole office. She found the internship physically difficult. She worked mostly from home, and her supervisor only required her in the office when she felt better.

Plaintiff also described difficulties due to chronic pain she experienced completing her associates degree in criminology in May 2006. The pain made writing very difficult, requiring special assistance from her teachers and extended time to complete her assignments. She confirmed that DVR provided financial aid for her education, but no further assistance from DVR is forthcoming until after surgery for relief of her debilitating pain.

In reference to her current symptoms, plaintiff stated that the neck pain causes spasms that travel down the right side of her body into the upper right extremity. She also experiences numbness. She testified that Dr. Yalamanchili recommended surgery for the injury to her neck. Plaintiff detailed the conservative treatment options she has undergone, which provided minimal relief, however the pain continues to worsen. Plaintiff has continued with physical therapy since she is not financially capable to presently pay for surgery.

She also detailed her other health issues. Plaintiff noted her history of thyroid problems, and that a nodule removed in 2002 has regrown. She frequently suffers from lower back pain that requires medication. Plaintiff stated she has lost sight in her right eye, and problems have started with her left eye. She also has difficulty breathing due to asthma.

Regarding her mental health, plaintiff referenced being treated for depression

and anxiety and taking Zoloft. She stated she gets nervous easily, and that her memory is poor.

According to plaintiff, sleeping is difficult and generally she can only lie down for two to four hours because of pain. She claimed that she currently could not perform her prior job at Cigna because she can not sit or stand for very long, and her concentration is poor. She stated that she could walk, stand, and sit for only fifteen minutes before needing a break. She indicated she can only lift up to seven pounds, and such activity causes significant pain.

Regarding household activities, plaintiff testified that cooking is limited to microwave dinners. She is only able to do mini loads of laundry. Family members help with yard work and home maintenance. She still attends church once a week, but has difficulty sitting through a service.

She claimed that after surgery, she intends to return to work, but feels that any employment or continued education is presently impossible.

During examination by the ALJ, plaintiff stated that her current income is alimony. She further described how she completed her degree and internship. She started school before her injury, and thereafter could only take a couple classes each semester, with no more than two classes in a single day because of pain. She purportedly required special accommodations from her teachers, such as recording her classes or taking extra time for tests.

II. Examination of Vocational Expert Dr. James Ryan:

During the hearing, the ALJ asked Dr. Ryan a hypothetical question as to whether a person with the following limitations and health conditions could perform

sedentary work:

> [W]ho's 43 years of age on her onset date, has a 12th grade education, plus an associates degree in science, past relevant work as indicated, right-handed by nature, suffering from various ailments, including degenerative disc disease, mostly at the C4-5 level . . . she has depression and thyroidism . . . pain and discomfort of her neck, back, and some radiation of that pain . . . be able to lift ten pounds on occasion, lesser amounts frequently, sit for 30 minutes, stand for ten minutes, sit 15 minutes, consistently on an alternating basis during an eight-hour day, five days a week . . . [and is required to] avoid odors, gases, fumes, dusts . . . due to her asthmatic condition.[49]

Dr. Ryan responded affirmatively and presented examples of jobs for which plaintiff was qualified.  He did admit that she would not perform her past work with the limitations propounded.  On cross examination by plaintiff's attorney, Dr. Ryan was asked about the expected use of the upper extremities (reaching, handling, and fingering) associated with the proffered employment.  His answer was occasional.[50]  In addition, when the description of the hypothetical disabled employee was further limited to standing and walking for no more than two hours in an eight hour workday, with that individual missing more than four days of work per month, Dr. Ryan responded such a person could not find competitive employment.[51]

When further presented with a hypothetical individual whose concentration was limited to two hour segments and would miss three days per month due to mental health problems,  Dr. Ryan testified that such a person is employable, although work productivity would be reduced by twenty percent.[52]

**Findings of the ALJ**

---

[49] *Id.* at 62.
[50] *Id.* at 64.
[51] *Id.* at 66.
[52] *Id.* at 66-68.

In his opinion of August 6, 2008, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the SSA through December 31, 2008.
2. The claimant has not engaged in substantial gainful activity since January 1, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
3. The claimant has the following severe impairments: cervical, thoracic, and lumbar degenerative disc disease, depression, right eye vision deficiency (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as that term is defined in 20 CFR 404.1567(a) and 416.967(a), but that due to neck and back pain, the claimant must periodically and at will alternate between sitting and standing positions. In addition, the claimant cannot engage in activities requiring repetitive neck-turning or unlimited visual acuity, and she is limited to the frequent rather than continuous use of her right upper extremity. Moreover, the claimant must avoid climbing to or working at heights or with hazardous machinery, and she cannot work in the vicinity of extreme temperatures or humidity, odors, gases, fumers, dusts, or other respiratory irritants. Finally, due to the combination of the claimant's impairments, she has moderately impaired reliability, concentration and persistence which limit her to a non production-pace level of unskilled sedentary work.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7. The claimant was born on July 9, 1960 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding tha tthe claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Considering the claimant's age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).
11. The claimant has not been under a disability, as defined in the Social

Security Act, from January 1, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).[53]

## Standard of Review

This court's review is limited to determining whether the final decision of the Commissioner is supported by substantial evidence.

Substantial evidence is less than preponderance but more than a mere scintilla. It is such relevant evidence as a reasonable mind would accept as adequate support for conclusion. It must do more than create a suspicion of the existence of a fact to be established . . . it must be enough to justify, if the trial were put to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.[54]

The Supreme Court has embraced a similar standard for determining summary judgment pursuant to Fed. R. Civ. P. 56:

The inquiry performed is the threshold inquiry of determining whether there is a need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of evidence, however, a verdict should not be directed. [55]
Overall, this test is differential and this court must give deference to agency inferences from facts if those inferences are supported by substantial evidence, even where a court acting *de novo* might have reached a different result.
Furthermore, evidence taken as a whole must be sufficient to support a conclusion by a reasonable person, not just the evidence consistent with agency's decision.
Thus, a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is the evidence substantial if it is

---

[53] *Id.* at 14, 16, 19, 22-24
[54] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).
[55] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

overwhelmed by other evidence – particularly certain types of evidence
(e.g. that offered by treating physicians) – or if it really constitutes not
evidence but a mere conclusion.[56]

Where, for example, countervailing evidence consists primarily of the claimant's
subjective complaints of disabling pain, the ALJ "must consider the subjective pain and
specify his reasons for rejecting these claims and support his conclusion with medical
evidence in the record."[57]

Cross-motions for summary judgment are merely claims that each side alone is
entitled to summary judgment. Such apparently contradictory positions do "not
constitute an agreement that if one is rejected the other is necessarily justified or that
the losing party waives judicial consideration and a determination whether genuine
issues of material fact exist."[58]

Moreover, "[t]he filing of cross-motions for summary judgment does not require
the court to grant summary judgment for either party."[59]

**Discussion**

The Supplemental Social Security Income (SSI) program was enacted in 1972 to
assist "individuals who have attained the age of 65 or are blind or disabled" by setting a
minimum income level for qualified individuals.[60] A claimant – in order to establish SSI
eligibility – bears the burden of proving that he is unable to "engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment

---

[56] *Monsour Med. Ctr. v . Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[57] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990).
[58] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[59] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).
[60] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381
(1982 ed.)).

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of or not less than twelve months."[61]  Moreover, "the physical or

mental impairment or impairments must be of such severity that the claimant is not only

unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in

significant numbers in the national economy."[62]  Furthermore, a "physical or mental

impairment" is an impairment that results from anatomical, physiological, or

psychological abnormalities which are evidenced by medically acceptable clinical and

laboratory diagnostic techniques.[63]

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled.[64]

> In step one, the Commissioner must determine whether the claimant is
> currently engaging in substantial gainful activity.  If a claimant is found to
> be engaged in substantial activity, the disability claim will be denied.  In
> step two, the Commissioner must determine whether the claimant is
> suffering from a severe impairment.  If the claimant fails to show that her
> impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of
> the claimant's impairment to a list of impairments presumed severe
> enough to preclude any gainful work.  If a claimant does not suffer from a
> listed impairment or its equivalent, the analysis proceeds to steps four and
> five.  Step four requires the ALJ to consider whether the claimant retains
> the residual functional capacity to perform her past relevant work.  The
> claimant bears the burden of demonstrating an inability to return to her
> past relevant work.
>
> If the claimant is unable to resume her former occupation, the
> evaluation moves to the final step.  At this stage, the burden of production
> shifts to the Commissioner, who must demonstrate the claimant is capable

---

[61] 42 U.S.C. § 423(d)(1)(A).
[62] 42 U.S.C. § 423(d)(2)(A).
[63] 42 U.S.C. § 423(d)(3).
[64] *See* 20 C.F.R. §416.920(a).

of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[65]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis stops.[66]

**The ALJ's Decision:**

The ALJ initially determined that plaintiff met the requirements of the first three steps. Plaintiff has not been engaged in substantial gainful activity since her fall in late 2003.[67] The ALJ concluded that plaintiff's cervical, thoracic, lumbar degenerative disc disease, right eye impairment, and diagnosed depression are all severe impairments that meet the qualification of step number two. Plaintiff passes the third step since none of the severe impairments identified, either individually or as a whole, were determined to be medically equal to any listed impairment under 20 CFR 404, Subpart P, Appendix 1 ("Appendix 1") that would compel the designation of disability.

Concerning step four, plaintiff does not qualify to do her past work as a customer service job at Cigna or the laborer position at the Port of Wilmington.[68] As a result, the analysis moved to the fifth step to determine if there are any positions available in the

---

[65] *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).
[66] *See* 20 C.F.R § 404.1520(a).
[67] Completing an associates degree does not qualify since the work must usually be done for pay or profit. 20 C.F.R. § 404.1572(a).
[68] The VE testified that the Cigna job is considered both a sedentary, semi-skilled and light, skilled level position. The position with the Port of Wilmington is a medium exertional level, unskilled job.

national economy for plaintiff considering her severe impairments.

The ALJ relied on the testimony of the VE in response to a hypothetical person of similar impairments to conclude that there are significant numbers of available positions in the national economy that plaintiff is able to perform. Thus, the ALJ discounted certain limitations contained in the RFC assessment by plaintiff's treating physician, Dr. Goodman, because there was a lack of medical evidence to justify those restrictions.[69]

**Plaintiff's Claims**

### A. The ALJ Improperly Discredited the Plaintiff's Treating Physician

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[70] Moreover, it will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on record.[71]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[72] If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[73]

If an ALJ chooses not to give a treating physician's opinion controlling weight, he

---

[69] *Id.* at 20.
[70] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)
[71] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[72] *Morales v. Apfel*, 225 F.3d 310, 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).
[73] *Plummer*, 186 F.3d at 429.

will look at factors that include (1) examining relationship; (2)(i) length and frequency of treatment; (2)(ii) nature and extent of the treatment relationship; (3) degree to which the evidence supports the opinion; (4) consistency of the record as a whole; (5) specialization of the physician; and (6) other factors.[74]

In the hypothetical the ALJ propounded to the VE during the hearing, he omitted certain restrictions identified by the treating physician, Dr. Goodman:  that the person would miss four days of work per month, and be limited to two hours of sitting and standing in a eight hour work day.  The hypothetical by the ALJ stated that the person can sit for thirty minutes, stand for ten, and sit for fifteen on an alternating basis during an eight-hour day, five days a week.    Plaintiff's attorney on cross examination added the excluded restrictions opined by Dr. Goodman, causing the VE to conclude the absence of any available jobs in the national economy.  Since the ALJ omitted relevant aspects of the treating physician's medical opinion, the ALJ must meet certain burdens.

The ALJ stated that he discounted Dr. Goodman's opinion in part because no medical evidence supported the findings, not because plaintiff was able to complete her education as argued by her attorney.  Nothing in Dr. Goodman's notes indicated a limitation of two hours sitting and standing per day.  While Dr. Goodman was plaintiff's treating physician, the treatment for back and neck pain was referred to specialists Dr. Yalamanchili (neurological) and Dr. Beneck (physical rehabilitation), who never imposed similar limitations.  Dr. Goodman's restrictions were contradicted by state consultants, Drs. Lifrak, Borek, and Acuna who had the same medical information as Dr.

---

[74] *See* 20 C.F.R. 404.1527(d)(1)-(6).

Goodman.[75]  Although the RFC prepared by Dr. Goodman was completed after the state consultants' evaluations, the primary diagnosis, a large central disc herniation, remain unchanged.  Possibly the ALJ's reasoning could have been more detailed, however, substantial evidence supported his conclusions.

### B.  The Hypothetical Question was Deficient as a Matter of Law

Plaintiff argues that the ALJ's hypothetical question to the VE failed to properly describe her right upper extremity as limited to only frequent use.

"[A]n ALJ's hypothetical must include all of a claimant's impairments" that are supported by the record.[76]  Furthermore, the ALJ may only consider the VE's testimony if the hypothetical "accurately portrays the claimant's individual physical and mental impairments."[77]  If the hypothetical fails to properly include the claimant's impairments and limitations, the VE's testimony cannot be considered substantial evidence.[78] However, the ALJ "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments."[79]  The ALJ need only consider every material and credible limitation established by supporting medical evidence.[80]

Plaintiff's argument fails to account for the cross examination by her attorney, who specifically asked the VE whether a person limited to use only her left upper

---

[75]  These physicians recognized the same medical diagnosis, but contradicted Dr. Goodman by determining that plaintiff could sit for six hours and stand for up to two hours in a eight hour workday.

[76] *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004).

[77] *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).

[78] *Ramirez*, 372 F.3d at 552.

[79] *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2000).

[80]  *Plummer*, 186 F.3d at 431.

22

extremity could participate in the jobs enumerated. The VE responded affirmatively. In fact, this limitation as presented by the plaintiff's attorney was more severe than the actual limitation of having frequent use of the right upper extremity.

In addition, the VE testified that the positions required only occasional use of the upper extremities. Because plaintiff has frequent use of her right upper extremity, she could perform positions that require frequent or less use of the upper extremities. Plaintiff is only restricted from continuous use. Therefore, the VE's testimony qualifies as credible evidence for the ALJ to consider.

### C. There was an Unresolved Conflict Between the VE and the DOT

According to the policy interpretation under SSR 00-4p, any occupational evidence presented by the VE should be consistent with the Dictionary of Occupational Titles (DOT).[81] "However, this court has "not adopted a general rule that an unexplained conflict between a VE's testimony and the DOT necessarily requires reversal."[82] If the conflict is minimal in that the limitations still qualify a claimant for the position as listed in DOT, then remand is not warranted.[83]

The VE testified that the jobs to which plaintiff was qualified required occasional use of the upper extremities. The DOT positions identified by the VE, however, require frequent usage. The RFCs indicate that plaintiff was limited to "frequent" use of her extremities, which is less restrictive than occasional. Because plaintiff's restrictions are consistent with the limitations under DOT, she is qualified to perform the jobs identified

---

[81] SSR-00-4p, 2000 WL 1898704.

[82] *Jones v. Barnhart*, 364 F.3d 501, 506 n.6 (3d Cir. 2004).

[83] *Tisoit v. Barnhart*, 127 Fed. Appx. 572, 575 n.1 (3d. Cir. 2005).

by the VE.  Thus, any purported conflict is minimal and does not require remand.

## ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 21) be DENIED.

(2) Defendant's cross-motion for summary judgment (D.I. 26) be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.Del.LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  Fed. R. Civ. P. 72(b).  The written objections and response are each limited to ten (10) pages.

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov.


Dated: July 19, 2011                          /s/ Mary Pat Thynge_____
                                                      UNITED STATES MAGISTRATE JUDGE